UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANGELA HILL,                              )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )   CASE NO. 1:08-cv-0740-DFH-JMS
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of the                       )
Social Security Administration,           )
                                          )
              Defendant.                  )

ENTRY ON JUDICIAL REVIEW

Plaintiff Angela Hill seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her application for disability insurance benefits and supplemental security income under the Social Security Act. Acting for the Commissioner, an Administrative Law Judge (ALJ) determined that Ms. Hill was not disabled under the Social Security Act because her impairments did not meet or equal a listed impairment and she could perform work available in the national economy. For the reasons discussed below, the court affirms the Commissioner's decision.

*Background*

Angela Hill was born in 1966. She completed high school and attended some community college courses. R. 248. She worked consistently from 1993-2004 as a cashier, customer service representative, and home health care

assistant.  R. 118.  She worked from August 2005 to January 2006 as a cashier.
R. 251.    She worked from June 2006 to January 2007 for a temporary
employment agency performing data entry.  R. 249-50.  She applied for disability
insurance benefits and supplemental security income on September 9, 2004.  R.
69, 240.    She claimed disability because of a recurring hernia, gall bladder
surgery, HIV-positive status, and depression.  R. 117.  Ms. Hill's application for
disability benefits was denied initially on December 5, 2004, and on
reconsideration on January 24, 2005.  R. 44, 48.  Her application was denied on
December 5, 2004.  R. 234.  Administrative Law Judge Robert Hanson denied Ms.
Hill's claims on December 21, 2007.  R. 10.  The Appeals Council denied her
request for review.  R. 4.

I.      *Medical Record*

Ms. Hill is HIV-positive, but anti-retroviral drugs have kept her
asymptomatic for many years.  Since at least 2003 she has visited several
departments at the Indiana University Hospital in Indianapolis.  The record
contains one set of medical records for non-HIV-related care that she received in
2003 and 2004 and two related sets of medical records for both HIV-related and
non-HIV-related care.

The first, non-HIV-related records include complaints of back and chest
pain.  In January 2003, she reported back pain, and Dr. Kenneth Stookey wrote

that she had "straightening of the lumbar spine" and "mild levoscoliosis of the lumbar spine." R. 190. In March 2003, she reported chest pain, and Dr. Erik Cressman reported that she had a normal chest exam. R. 191.

The second set of records focuses on Ms. Hill's attendance at an infectious disease clinic at the IU Hospital for treatment of HIV and other health problems. The records also detail a gall bladder surgery and some visits to other IU Hospital departments. This set of records is discussed below.

In January 2004, Ms. Hill visited the infectious disease clinic and had no complaints other than a runny nose, cough, and congestion. R. 144. She also reported no problems with nausea, vomiting, and diarrhea. *Id.* Her viral load was below 50, and her CD4 count was 834. *Id.* [1] In April 2004, Ms. Hill visited the clinic and reported a recent emergency room trip for sinus pressure, coughing, and a low grade fever. R. 143. She denied that she had severe fevers, weight loss, or decreased appetite. *Id.* She reported mild headaches that were resolved when she began taking Zithromax. *Id.* Dr. Kenneth Fife wrote that she suffered from iron deficiency anemia, but Ms. Hill told him that anemia-related fatigue was not a problem when she took iron supplements. *Id.* From June to August 2004, however, Ms. Hill reported problems described as nausea, "abdominal discomfort that . . . usually occurs after spicy foods, fried foods, or greasy foods," and "right

---

[1]CD4 is "a glycoprotein found on various subsets of T cells." Stedman's Medical Dictionary 356 (26th ed. 1995). A CD4 test measures how many T cells contain the CD4 receptor.

upper quadrant pain."   R. 142, 146-47.   She was diagnosed with biliary dyskinesia, which is a gall bladder disorder.  R. 147.  She also had a "recurrent umbilical hernia."  R. 140.  In August 2004, Dr. David Canal performed a gall bladder removal.  R. 147-49.

Ms. Hill visited the clinic a week before her surgery, and Dr. Fife made several positive observations.   He noted that she had no symptoms of HIV progression, that her job was stable, that she was in a "great relationship currently," and that "things are going very well for her."  R. 139.  He also wrote: "Other than having some abdominal discomfort approximately 3-4 times a week that is usually after spicy foods or high-fat foods, she has no other concerns."  *Id.*

In September 2004, a month after the surgery, Dr. Canal wrote that Ms. Hill was doing "very well" overall.  R. 138.  In November 2004, Ms. Hill reported that she was doing well, aside from problems with her daughter and some sinus congestion.   R. 137.   Dr. Fife wrote that Ms. Hill's HIV viral load had been undetectable since 1999.  *Id.*

In February 2005, clinic nurse Vicki Wilkey wrote that Ms. Hill had an uncharacteristically high HIV viral load count. R. 198. The high count prompted Wilkey to perform another viral load test, which showed that Ms. Hill's HIV viral load was below fifty as was normal.   *Id.*   She also wrote that Ms. Hill was "continuing to feel well" and that she had no "nausea, vomiting, diarrhea . . .

cough or headaches."  *Id.*  Wilkey noted that Ms. Hill was taking care of her children, had some difficulties with her daughter, and reported being "moody."  *Id.*  In May 2005, Ms. Hill visited the HIV clinic and had "no concerns . . . in terms of nausea, vomiting, diarrhea, cough, or shortness of breath."  R. 200.  She also reported that a recent increase in the strength of her Prozac prescription had made her less moody.  R. 201.

At an August 2005 visit to another department at IU Hospital, Ms. Hill complained of several ailments, some of which are relevant to her benefits claim.  She told Dr. Timothy Pettigrew, whom she described as her main doctor, that she had severe heartburn that caused her to go to the emergency room in July 2005.  R. 203, 260-61.  The emergency room doctor determined that she suffered from reflux disease.  R. 203.  She complained of musculoskeletal problems, including pain in her left knee, back, leg, and right elbow.  *Id.*  She complained of reduced exercise tolerance and heavy breathing during exercise.  *Id.*  She complained of hair loss, skin dryness, itching, and easy bruising.  R. 204.

In April 2006, Ms. Hill returned to the infectious disease clinic.  She reported occasional diarrhea and an increase in depression.  R. 206.  She reported increased difficulty dealing with a history of molestation by her step-father when she was a child.  R. 207.  Ms. Hill also reported that she recently began taking business classes in the evenings.  *Id.*  She visited another department at IU Hospital on the same day and reported similar problems.  R. 208-09.  At this

second visit, Dr. Pettigrew administered a depression questionnaire, and Ms. Hill scored in the "severe range." R. 209-10. Ms. Hill visited Dr. Pettigrew again in September 2006. She reported that she had not seen a psychiatrist whom IU doctors recommended to her. R. 212. At the last IU visit in the record, also in September 2006, Ms. Hill reported emotional difficulty dealing with sexual abuse by her step-father and also reported concerns about her relationship with her boyfriend. R. 213.

Ms. Hill had a lumbar spine MRI in March 2005. The MRI found some moderate abnormalities but noted that the "lumbar vertebral body and intravertebral disk space heights and signal intensities appear within normal limits." R. 214. Dr. Kendall Capecci, who analyzed the MRI, concluded that Ms. Hill had "facet degenerative changes," "moderate bilateral foraminal encroachment at L5-S1," "no significant central canal stenosis," and "no disk herniation." *Id.* In a May 2005 letter, Dr. Purita Villanueva explained that Ms. Hill had "moderate dextro-scoliosis," "degenerative joint disease," and "narrowed disk space between L1-2." R. 215. Dr. Villanueva gave Ms. Hill a diagnosis of sciatica neuritis. *Id.*

In October 2004, Dr. Jerome Modlik, Psy. D., performed a psychological evaluation on Ms. Hill. He wrote that Ms. Hill had a normal demeanor during the evaluation, including no manifestations of excessive anxiety. R. 170-71. He wrote that she was "oriented in all spheres." R. 171. At the evaluation, Ms. Hill described her mood over the past month as "very stressed out, want to cry a lot,

tired." *Id.* She also said that she was angry and irritable. R. 172. She said that she had been fatigued, felt worthless, felt guilty, and had crying episodes. *Id.* She said that she attempted suicide when she was twelve in response to sexual abuse from her step-father. *Id.* She said that she attempted suicide when she was twenty-seven because she was angry at the father of her children, but she denied having recent suicidal thoughts. *Id.* She said that she could not sleep for more than a few hours at a time. *Id.* She reported panic-attack-related symptoms, but Dr. Modlik did not think that these symptoms were indicative of actual panic attacks. *Id.* Rather, he suspected that they were a "release of contained emotions." *Id.* Ms. Hill also reported obsessive-compulsive symptoms. Dr. Modlik wrote that her "range of affect was probably within normal limits." *Id.* He also wrote that she appeared dysphoric and that her "thought processes were coherent, logical, and pertinent." *Id.* Dr. Modlik concluded:

> Angela Hill would appear to be functioning in the low-average range of intelligence. I believe she has some mild problems with concentration. She reported a good deal of affective symptoms in the form of depression. She has been treated for depressive symptoms and suicidal ideation in the past.

R. 172-73.

In November 2004, Dr. J. Pressner reviewed Ms. Hill's psychological records. He concluded that her impairments were not severe and that she had a non-mental impairment that required another referral. R. 154. He also concluded that Ms. Hill had mild limitations in activities of daily living, maintaining social

functioning, and maintaining concentration, persistence, or pace, and no limitations in "decompensation." R. 164. Dr. Pressner said that Ms. Hill had no more than moderate limitations:

> Medical records do not suggest a significant mental condition. . . . Dr. Modlik did not provide any medical opinion in regard to specific functional limitations although he supplied a GAF of 60 which would suggest no worse than modera[te] limitations. . . . The claimant may suffer from depression, but the reports of functioning from the claimant's mother and friend do not suggest severe limitations due to a mental impairment. The claimant appears to perform goal directed activities limited only by the claimant's physical condition. The claimant's concentration and social functioning appear from these descriptions to be within normal limits. Therefore it is reasonable to conclude that the claimant's condition is not severely limiting at this time.

R. 166. Finally, Dr. Pressner wrote that she needs a "suicide screen." R. 152.

On October 18, 2004, Dr. Iyas Yousef evaluated Ms. Hill's physical condition. Ms. Hill reported chronic fatigue, chronic nausea, chronic diarrhea, occasional vomiting, and pain that goes from her right foot to the right side of her lower back. R. 181.[2] She reported that she could walk one mile, climb three flights of stairs, lift twenty-five pounds, sit for six hours, and stand for three hours. *Id.* She also reported monthly migraine headaches that lasted for three days. R. 182. Dr. Yousef concluded that Ms. Hill suffered from "chronic nausea and diarrhea in addition to occasionally vomiting most likely secondary to HIV medication," "depression and chronic fatigue with two suicidal attempts,"

---

[2]However, in the next page of his report, Dr. Yousef wrote that Ms. Hill "reports no nausea, vomiting, diarrhea, constipation, bloody or tarry stool, or significant weight change." R. 182.

"migraine headaches," "incisional hernia status post repair twice," and "right lower extremity and lower back discomfort."   R. 183.   At the Indiana Disability Determination Bureau's request, Dr. F. Montoya concluded that Ms. Hill had a non-severe physical impairment.  R. 179.

The Administration completed Disability Determination and Transmittal forms in November 2004 and January 2005 that listed "affective disorders" as Ms. Hill's primary diagnosis and HIV as her secondary diagnosis.  R. 34, 36.   The forms stated that she was not disabled through the date of the determinations. R. 34, 36.

II.      *Testimony at the Hearing*

Administrative Law Judge Robert Hanson held a hearing on Ms. Hill's claims on August 6, 2007.  Ms. Hill testified that she had back pain that extended down the right side of her body to her feet.  R. 256.  She testified that she had high blood pressure, which caused nausea.  R. 257.  She testified that she had headaches at least four times a week that caused her to be sensitive to light, sound, and other sensations.  R. 258.  She testified that she was often stressed, suffered from anxiety attacks, and often wanted to be alone. R. 259.  She testified that she had trouble breathing, had chest pain, and often vomited during her panic attacks, which occurred three to four times a week.   R. 263-65.   She

testified that she had to go to the emergency room for her panic attacks.  R. 264. She testified that her medications caused nausea and diarrhea.  R. 260.

Ms. Hill testified about her physical abilities and daily activities.  She testified that she could lift less than ten pounds on a regular basis, but not all day.  R. 261.  She testified that she could walk, stand, or sit for less than thirty minutes at a time.  *Id.*  She testified that she could perform household chores and spend time with her children.  R. 262.  She testified that she could sleep for only two hours at a time because of anxiety.  R. 263.

Adrian Love, who lived with Ms. Hill, testified at the hearing.  He testified that Ms. Hill had panic attacks about four times a week.  R. 268.  He testified: "When she's having a panic attack, she's just shaky and scary and like she acts . . . like she's out of control.  She [does not] know like really what to say or what to do."  R. 267.  He testified that Ms. Hill passed out during one of her panic attacks.  R. 267-68.

Vocational Expert Michael Blankenship testified at the hearing.  Mr. Blankenship listened to Ms. Hill's testimony, and he testified that she could not perform any work if her testimony were credited completely.  R. 272.  He testified that Ms. Hill could not work if she could lift no more than ten pounds and could stand, walk, and sit no more than thirty minutes at a time.  *Id.*  The ALJ then posed a hypothetical question to Mr. Blankenship:

Let's talk about some different hypothetical folks of the same age, education, and work experience as the present Claimant.  Our hypothetical individuals have a combination of exertional and non-exertional limitations arising out of HIV infection, anemia, hypertension, of the Claimant's height and weight, we've got headaches and depression and degenerative disc disease and the consequence of which with the symptoms they produce, our hypothetical individuals are limited in the following respects.  They are restricted to work processes that are simple and repetitive in nature and that's our only non-exertional limitation.

R. 272.  The ALJ limited the hypothetical individual to sedentary work and specified that the individual could sit for six hours out of an eight-hour day and could lift a maximum of ten pounds occasionally.  R. 273.  Mr. Blankenship testified that this hypothetical individual could work as a receptionist, information clerk, and assembler.  R. 273-74.

*Framework for Determining Disability and the Standard of Review*

To be eligible for the disability insurance benefits and supplemental security income she seeks, Ms. Hill must establish that she suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Ms. Hill was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based

on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her in the immediate area, or whether she would be hired if she applied for work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Ms. Hill was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520 and § 416.920.  The steps are as follows:

(1)    Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that were severe?  If not, she was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)     If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. §§ 404.1520, 416.920.[3]  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At step one, the ALJ found that Ms. Hill was not engaging in substantial gainful activity.  R. 14.  However, he concluded that Ms. Hill's data entry work from June 2006 to January 26, 2007 constituted substantial gainful activity, and he did not consider her potential disabilities during this period.  *Id.*  At step two, the ALJ concluded that Ms. Hill had "'severe' impairments consisting of degenerative disc disease, an infection of the human immunodeficiency virus, hypertension, headaches, anemia, obesity, and depression."  *Id.*  The ALJ also said that Ms. Hill had a history of gall bladder disease, had a cholecystectomy performed, and had an umbilical hernia surgically repaired, but he did not find these impairments to be severe.  *Id.*

At step three, the ALJ found that none of Ms. Hill's impairments met or equaled a listing.  R. 14.  He wrote that the degenerative changes on Ms. Hill's

-----

[3]Ms. Hill filed for both disability insurance benefits and supplemental security income benefits, which are covered in §§ 404 and 416, respectively, of the regulations.  The requirements for determining medical disability under both sections are listed in Subpart P of Section 404.  See 20 C.F.R. § 416.925.

spine did not meet the level of severity required by Listing 1.04. *Id.* He then found that her impairments did not meet Listing 7.02 for anemia because her hematocrit level was not low enough. R. 15. The ALJ concluded that Ms. Hill met the introductory requirements for Listing 12.04 for depression because "she has a depressive syndrome which causes suicidal thoughts, feelings of guilt, sleep disturbance and concentration deficits." *Id.* However, he concluded that she did not satisfy Listing 12.04's secondary requirements because "depression only mildly impairs her daily living activities and social functioning, and it has never caused her to deteriorate for an extended period of time." *Id.* The ALJ did not discuss Listing 12.06 for anxiety. The ALJ determined that Ms. Hill did not suffer from any of the opportunistic diseases that are discussed in Listing 14.08 for HIV. R. 16. The ALJ discussed Ms. Hill's headaches and hypertension. Because there are no listings for these conditions, the ALJ evaluated them based on similar listings. *Id.* He found that Ms. Hill's headaches and hypertension did not meet listing severity. *Id.* Finally, the ALJ addressed obesity. He concluded that Ms. Hill's "excessive weight does not give rise to any condition or combination of conditions that meets or equals the criteria for any listed impairment." *Id.*

At step four, the ALJ concluded that Ms. Hill could not perform her past relevant work. The ALJ made a function-by-function assessment and concluded that Ms. Hill could carry ten pounds occasionally and lesser weights frequently, sit for six hours in an eight-hour workday, walk and stand for two hours in an eight-hour workday, and use her hands and fingers for repetitive hand-finger

actions.  R. 16 n.1.  He wrote that Ms. Hill was capable of performing "simple, repetitive tasks at the sedentary exertion level."  R. 16.  In reaching this conclusion, the ALJ discussed Ms. Hill's blood pressure, gastrointestinal symptoms, HIV status, anemia, back pain, and mental symptoms.  The ALJ addressed each limitation, and he concluded that none of them precluded her from working.  R. 18-23.  However, he followed vocational expert Blankenship's suggestion that Ms. Hill's limitations did not allow her to perform any of her past relevant work.  R. 23.

At step five, the ALJ concluded that Ms. Hill could perform other work.  The ALJ based this conclusion on the vocational expert's assessment that the hypothetical individual could perform work as a receptionist and information clerk, assembly or production worker, and general office clerk.  R. 23.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.  42 U.S.C. §§ 405(g), 1383(c)(3).  Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, the reviewing court must uphold it. 42 U.S.C. §§ 405(g), 1383(c)(3); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by re-weighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level his analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning. *Diaz*, 55 F.3d at 307-08.

## Discussion

I.   *Due Process Claim*

Ms. Hill first argues that the ALJ's decision denied her due process because he made his own lay determinations and rubber-stamped the opinions of the

state's psychologists and physicians.  Ms. Hill criticizes an "institutional-agency wide policy and procedure of only selectively considering the evidence so as to exclude any of the evidence which proves a claimant's disability from the ALJ's decision."  Pl. Br. 13.  Ms. Hill's due process argument has no merit.

Ms. Hill is incorrect that the ALJ ignored all of the evidence suggesting that she was disabled.  The ALJ discussed evidence suggesting that Ms. Hill was disabled at many points.  For instance, he stated that Ms. Hill had "a depressive syndrome" and pointed out many of its symptoms.  R. 15.  The ALJ also listed Ms. Hill's various complaints, which made up the bulk of the evidence suggesting disability.  The ALJ discussed each of the alleged impairments and explained why he did not think that these impairments rendered her disabled.

Even an incomplete treatment of impairments does not give rise to a due process violation.  The ALJ is not required to list every piece of evidence offered and to discuss its relevance.  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  The ALJ did not fail to consider a contradictory opinion, nor did he fail to consider a specific alleged condition in this case.  See *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2000) (ALJ was not required to address every piece of evidence, but erred by failing to mention several pieces of contradictory evidence and contradictory opinion of the treating doctor).  The ALJ stated that he reviewed all available evidence, and he made specific references to Ms. Hill's claims.  The court

finds no error in the ALJ's determination and does not find a denial of due process in this case.[4]

II.     *The ALJ's Failure to Discuss Anxiety*

Ms. Hill next argues that the ALJ committed reversible error by failing to discuss Listing 12.06 in his Step 3 analysis.  Ms. Hill also argues that the ALJ considered but did not give sufficient weight to evidence of her anxiety.  The ALJ's discussion of anxiety was sufficient.

---

[4]In a later section of her brief, Ms. Hill points out nearly every piece of favorable evidence that the ALJ did not refer to directly.  Pl. Br. 22-29.  Ms. Hill argues that the ALJ's failure to consider all of the evidence that favored a finding of disability is non-constitutional error.  The court rejects this claim for the same reason that it rejects the due process claim.  The ALJ is not required to refer to every piece of evidence, and the ALJ did not ignore any contrary evidence that would support a finding that Ms. Hill met a listing or was unable to perform work.

Ms. Hill's strongest argument is that the ALJ ignored Dr. Yousef's impression that she suffered from chronic nausea caused by HIV, depression, and migraines.  R. 183.  However, the ALJ explained why some of Ms. Hill's complaints to Dr. Yousef were not credible because they were inconsistent.  The ALJ also explained at length why he concluded that Ms. Hill did not suffer from chronic nausea, migraines, and depression.  R. 15, 18-20.  The ALJ discussed Dr. Yousef's evaluation of Ms. Hill, and he was required to do no more.

Ms. Hill also argues that the ALJ ignored evidence of her back impairments.  See R. 214-15.  However, the ALJ considered and discussed this evidence.  R. 14, 21.  Additionally, SSA staff reviewed the record and determined that Ms. Hill was not disabled.  R. 34, 36.

The ALJ did not ignore evidence that Ms. Hill had attempted suicide twice.  R. 22.  In addition to noting the suicide attempts, the ALJ discussed Ms. Hill's mental health history thoroughly.

Listing 12.06 concerns anxiety-related disorders.  The ALJ discussed Listing 12.04, but he did not discuss Listing 12.06.  The Seventh Circuit has stated numerous times that "where an ALJ omits reference to the applicable listing and provides nothing more than a superficial analysis, reversal and remand is required."  *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).  However, the Seventh Circuit has refused to find that the ALJ must expressly refer to every potentially relevant listing.  *Id.* at 369-70.

Listing 12.06 requires "medically documented findings" of persistent or recurrent anxiety that severely limits a claimant's activities.  The only *medical* opinion on Ms. Hill's anxiety was Dr. Modlik's opinion that she was *not* suffering from anxiety-induced panic attacks.  Much of the evidence supporting a diagnosis of anxiety came from Ms. Hill's and Mr. Love's testimony and reports about her anxiety.  Ms. Hill also pointed to Dr. Pettigrew's statement that Ms. Hill "was told she was having a panic attack" by emergency room staff.  R. 204.

The record lacks sufficient documented findings of anxiety to have required the ALJ to discuss Listing 12.06.  See *Rice*, 384 F.3d at 369 (ALJ did not err in failing to discuss a listing when the record contained insufficient evidence to establish that claimant met all requirements of the listing).  No doctor diagnosed Ms. Hill with consistent anxiety or panic attacks, and no doctor suggested that she met Listing 12.06.  Dr. Yousef did remark that Ms. Hill "looks depressed and anxious."  R. 182.  Dr. Pettigrew wrote that she had a history of anxiety.  R. 211.

Aside from the testimony of Ms. Hill and Mr. Love and a second-hand statement from emergency room staff that Ms. Hill had a panic attack, there was no other evidence that she suffered from anxiety or panic attacks.  Because Listing 12.06 requires medically documented findings of persistent or recurrent anxiety that severely limited Ms. Hill's activities, the ALJ could have reasonably decided to analyze Ms. Hill's affective symptoms under Listing 12.04, for depression, rather than Listing 12.06.[5]

III.   *Testimony from Medical Advisors*

Ms. Hill argues that the ALJ committed reversible error when he failed to obtain testimony from medical advisors to determine whether her combined impairments met or equaled a listed impairment.  The regulations discussing medical equivalence require the ALJ to consider the opinion of one or more medical or psychological consultants designated by the Commissioner when determining whether an impairment medically equals a listing.   20 C.F.R. §§ 404.1526(c), 416.926(c).  Social Security Ruling 96-6p states:

---

[5]While the ALJ did not commit reversible error, the court gives no weight to the ALJ's statement that: "I infer from the claimant's failure to follow through with psychiatric treatment that she felt it unnecessary for the management of her symptoms."  R. 23.  This statement is inconsistent with SSA rules.  See Social Security Ruling 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."), printed in 61 Fed. Reg. 34483, 34487 (1996).  Many individuals with mental health problems are hesitant to seek mental health treatment for legitimate reasons.

> The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled.  As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments.  However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

61 Fed. Reg. 34466, 34468 (1996).  The ALJ need not summon a medical expert to testify at the hearing if a medical expert has signed a disability determination form that addresses whether the alleged impairment equals a listing.  *Id.*; *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989).

The record contains the findings of several state doctors.  First, the record includes two SSA-831-C3 Disability Determination and Transmittal forms that concluded that Ms. Hill was not disabled and included a primary diagnosis of "Affective Disorders" and a secondary diagnosis of "Human Immunodeficiency Virus (HIV) - Asymptomatic."  R. 34, 36.[6]  Second, Dr. Pressner completed a form concluding that Ms. Hill's mental impairments were not severe.  R. 154.  Third, Dr. Montoya concluded that Ms. Hill had a non-severe physical impairment.  R. 179.

---

[6]Ms. Hill argues that the form was not sufficient because it did not specifically mention anxiety attacks, panic attacks, or Listing 12.06.  Reply Br. 7.  The form does not need to be that specific.  The form listed "affective disorders," which includes mood disorders.

The ALJ considered the combined effects of Ms. Hill's impairments.  R. 15-16.  The ALJ the discussed several listings that could have applied to Ms. Hill's limitations.  He determined that her impairments did not meet or equal any of the listings.  He considered medical evidence while making these determinations, and the record contains multiple determinations from doctors stating that Ms. Hill was not disabled.  The ALJ did not commit reversible error when he failed to summon medical advisors to testify at Ms. Hill's hearing.

IV.     *The Credibility Determination*

Ms. Hill argues that the ALJ determined improperly that she was not credible because his determination did not comply with Social Security Ruling 96-7p.  The ALJ is responsible for determining credibility.  See, *e.g.*, *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).  The ALJ may discount subjective complaints that are inconsistent with the evidence as a whole, but the ALJ may not discount such complaints merely because objective medical evidence does not support the complaints.  *Id.* at 314; Social Security Ruling 96-7p, printed in 61 Fed. Reg. 34483 (1996).  The ALJ must give specific reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed.  SSR 96-7p; see *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (in making a credibility determination the ALJ must comply with the requirements of SSR 96-7p, which requires the ALJ to articulate the reasons behind credibility evaluations).

The ALJ chose to credit some of Ms. Hill's testimony.  *E.g.*, R. 21 (crediting Ms. Hill's complaints of back pain).  However, the ALJ discounted many of Ms. Hill's complaints, including nausea, migraines, and hypertension.  The record supports his decision.  The ALJ did not rely merely on the absence of medical evidence.  Rather, the ALJ explained why many of Ms. Hill's complaints were not credible.  He explained that Ms. Hill's statements in her testimony and to doctors were inconsistent.  R. 18-20, 22.  He also explained that medication often resolved her impairments.  R. 18.  The ALJ's credibility finding will not be disturbed unless it is "patently wrong in view of the cold record." *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986); see also *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995).  The ALJ's credibility determination was not patently wrong, and the court upholds it.[7]

V.     *Residual Functional Capacity Determination*

Ms. Hill's final argument is that the ALJ made an inaccurate assessment of her residual functional capacity.  The ALJ concluded that Ms. Hill could work "if limited to simple, repetitive tasks at the sedentary exertion level."  R. 16.  Ms. Hill argues that this conclusion ignored limitations caused by anxiety and side effects from HIV medication such as nausea and diarrhea.  As discussed above, the ALJ explained why he did not credit Ms. Hill's statements that she suffered from

---

[7]As noted above, the ALJ did not follow SSR 96-7p when he said that Ms. Hill's failure to see a psychiatrist was evidence that she felt that treatment was "unnecessary."  R. 23.  This statement was error, but not reversible error, because the ALJ discounted Ms. Hill's statements of anxiety and depression for other reasons.  See *id.*

nausea and diarrhea.  The ALJ also explained why Ms. Hill's affective disorder "was not associated with symptoms preclusive of simple repetitive tasks." R. 22-23.  The ALJ's assessment of Ms. Hill's residual functional capacity and his hypothetical to the vocational expert based on this residual functional capacity were not error.

*Conclusion*

Accordingly, the court affirms the Commissioner's denial of Ms. Hill's application for disability insurance benefits and supplemental security income. Final judgment shall be entered accordingly.

Date: February 20, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Patrick Mulvany
mulvany@onet.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov